UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

KENSINGTON PUBLISHING CORP.,

        Plaintiff,

    -v-                                  No. 05 Civ. 10529 (LTS)(AJP)

MADRIS GUTIERREZ a/k/a MADRIS DePASTURE
d/b/a NEW CONCEPTS PUBLISHING, and
ANDREA DePASTURE a/k/a JAIDE FOX,

        Defendants.

------------------------------------------------------x

## OPINION AND ORDER

        In this trademark infringement action, plaintiff Kensington Publishing

Corporation ("Kensington" or "Plaintiff") asserts that the use of the term "Bad Boys" in book

titles by defendants New Concepts Publishing, Inc. ("NCPI"), Madris Gutierrez ("Gutierrez"),

and Andrea Depasture ("Depasture") (collectively "Defendants") constitutes trademark

infringement and unfair competition under federal law in violation of Section 43(a) of the

Lanham Act, 15 U.S.C. § 1125(a).  Plaintiff asserts related claims under New York State

common law and the New York anti-dilution statute, N.Y. Gen. Bus. L. 360-l.  Plaintiff seeks

injunctive relief, an accounting of any profits that have resulted from Defendants' alleged

infringement, damages, and attorneys' fees.  The Court has jurisdiction of the claims arising

under federal law pursuant to 28 U.S.C. §§ 1331 and 1338(a) and of the claims arising under

state law pursuant to 28 U.S.C. §§ 1367 and 1338(b).  The parties' cross-motions for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure are currently before the

Court.  The Court has considered thoroughly the parties' submissions.  For the following reasons, the cross-motions for summary judgment are denied.

BACKGROUND[1]

Plaintiff is an independent publisher of hardcover, trade, and mass-market paperback books.  (February 13, 2007, Decl. of Laurie Parkin ("Parkin Decl.") ¶ 3.)[2]  Between August 2002 and November 2006, Plaintiff published twenty-two erotic romance novels with the term "BAD BOYS" in the title (the "BAD BOYS books") through its Brava imprint.[3]  (Parkin Decl. ¶¶ 4, 6.)  The BAD BOYS books share common themes involving romance, sex, and male characters who initially exhibit negative characteristics and who experience some sort of reformation or redemption by the end of the story, and are sold in collections of three or six stories written by one or more of Plaintiff's romance authors.[4]  (Id. at ¶¶ 4-6 & Ex. A.)  The BAD

---

[1]     The facts summarized below are undisputed unless otherwise noted.  Any fact that has been proffered, with evidentiary support, by a party in its statement of uncontested facts pursuant to S.D.N.Y. Local Civil Rule 56.1(a) and that has not specifically been controverted by the opposing party, is deemed admitted for purposes of the instant motions.  See Local R. 56.1(c).

[2]     Plaintiff has also submitted a March 13, 2007, Declaration of Laurie Parkin in Opposition to Defendants' Motion for Summary Judgment ("Parkin Opp'n Decl."), that is virtually identical to the February 13, 2007,  Declaration of Laurie Parkin in Support of Plaintiff's Motion for Summary Judgment.

[3]     The titles of the twenty-two BAD BOYS books are: I ♥Bad Boys; I Brake for Bad Boys; Bad Boys on Board; Bad Boys on Line; Bad Boys to Go; Bad Boys Next Exit; Bad Boys in Black Tie; Bad Boys Down Under; Immortal Bad Boys; Bad Boys With Expensive Toys; 3 Brides for 3 Bad Boys; Bad Boys Over Easy; Beach Blanket Bad Boys; Really Unusual Bad Boys; Bayou Bad Boys; Bad Boys Ahoy!; Bad Boys in Kilts; Bad Boys of Summer; Bad Boys Southern Style; Viva Las [sic] Bad Boys!; Texas Bad Boys; and British Bad Boys.  (Parkin Decl. ¶ 6.)

[4]     Plaintiff has submitted the twenty-two BAD BOYS books to the Court, all of which contain the term BAD BOYS in the title and bear the Brava imprint on the back cover.  The Court notes that some of these books list a single author and

BOYS books were conceived as a series prior to the publication of the first BAD BOYS title in August 2002.[5]  (Id. at ¶ 4.)  Plaintiff's BAD BOYS books are sold in chain bookstores such as Barnes & Noble, Borders, and Waldenbooks; by mass retailers including Target and amazon.com; and through Kensington's own website, www.kensingtonbooks.com.  (Id. at ¶ 7.)

Defendant NCPI is also a publisher of romance novels.  (Local Civil Rule 56.1 Statement of Uncontested Facts in Support of Pl.'s Mot. for Summ. J. ("Pl.'s Rule 56.1 Statement") ¶ 26.)  NCPI was primarily an e-book publisher when it was formed in 1996 or 1998, at which time its electronic copies of books were distributed via the internet.[6]  (Dep. of NCPI by Madris Depasture ("NCPI Dep."), annexed as Ex. A to February 13, 2007, Decl. of James D. Weinberger ("Weinberger Decl.") at 6:3-21.)  Since 2004, NCPI's sales have been split approximately equally between print books and e-books.  (NCPI Dep. at 61:4-7.)  NCPI is co-owned by Defendants Madris Gutierrez and Andrea Depasture.  (Dep. of Andrea DePasture ("Depasture Dep."), annexed as Ex. A to February 13, 2007, Decl. of Eric R. Leibowitz ("Leibowitz Decl.") at 16:24-17:8.)  Gutierrez, a/k/a Madris Depasture, is a published author who founded NCPI.  (NCPI Dep. at 29:9-30:24.)  Depasture, the daughter of Gutierrez, uses the pen name Jaide Fox and is the author of NCPI's title Intergalactic Bad Boys ("IGBB").  (Id. at 90:17-

---

others three or more authors; collectively twenty-four different authors are represented in the  BAD BOYS books.

[5]    In their response to Plaintiff's 56.1 Statement, Defendants purport to dispute this assertion but offer no contradictory evidence.  (Defs.' Response to the Local Civil Rule 56.1 Statement of Uncontested Facts in Support of Pl.'s Mot. for Summ. J. ("Defs.' Rule 56.1 Response") at 3.)

[6]    Plaintiff states that NCPI was first formed in 1998 (see Pl.'s Rule 56.1 Statement ¶ 26), but Defendants dispute this contention and assert that "NCPI was first formed in 1996, when it began publishing and distributing copies of electronic books via the internet."  (Defs.' Rule 56.1 Response at 10.)

23.)  IGBB was first published in October 2003 solely in an e-book format that was sold online

through NCPI's website, by which time Plaintiff had published four BAD BOYS books.[7]  (Id. at

111:16-22 & Ex. D.)  Defendants subsequently published IGBB in December 2004 as a

traditional print paperback book that was sold in chain bookstores.   (Id. at 111:23-112:6; 199:2-

201:9.)  IGBB was also marketed and sold as part of an anthology that contained two separate

books: IGBB, and a sequel, Intergalactic Pain in the Ass.  (Id. at 92:16-2.)  The title for the online

version of this anthology was Intergalactic Mayhem I & II, whereas the title for the bookstore

version was Intergalactic Bad Boys.  (Id. at 93:5-96:17.)

By letter dated June 24, 2005, Plaintiff advised Defendants of its BAD BOYS

books and its claim of exclusive rights in the mark for romance novels, and demanded that NCIP

"immediately cease distributing [IGBB], and any other work that contains the 'Bad Boys'

trademark in the title."  (Weinberger Decl. Ex. J.)  Defendants elected not to comply with the

demand letter and this litigation ensued.

DISCUSSION

A grant of summary judgment is appropriate only if "there are no genuine issues

of material fact and the moving party establishes its right to judgment as a matter of law."  EMI

Catalogue P'ship v. Hill, 228 F.3d 56, 61 (2d Cir. 2000) (citing Fed. R. Civ. P. 56(c)); see also

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A dispute about a material fact is genuine

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

---

[7]      Defendants allege that Plaintiff had only published two BAD BOYS books as of
October 2003.  (Defs.' Rule 56.1 Response at 5.)  Plaintiff has proffered evidence
that four BAD BOYS books were published as of October  2003.  (See March 23,
2007, Reply Decl. of James D. Weinberger ("Weinberger Reply Decl.") ¶ 2 & Ex.
M; supra n. 4.)

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When deciding a motion for summary judgment, "all ambiguities must be resolved and all reasonable inferences drawn in favor of the party opposing the motion."  See EMI Catalogue P'ship, 228 F.3d at 61 (citing Anderson, 477 U.S. at 255).  However, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (internal citation and quotations omitted).  When considering cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  Schwabenbauer v. Bd. of Educ. of Olean, 667 F.2d 305, 314 (2d Cir. 1981).

Federal Trademark Infringement – Unfair Competition Claim

Plaintiff claims that it has protectable rights in the "BAD BOYS" mark that it has used for its series of romance novels, and asserts that Defendants have violated Section 43(a) of the Lanham Act, which imposes liability for the infringement of an unregistered mark.   Section 43(a) provides for the civil liability of:

> Any person who, on or in connection with any goods . . . uses in commerce any word, term, name, symbol, or device . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods . . . ."

15 U.S.C.A. § 1125(a)(1) (West 2006).  To prevail on its trademark infringement claim under § 43(a), Plaintiff must demonstrate that (1) BAD BOYS is a valid mark that is entitled to protection, and (2) Defendants' use of its own mark infringes, or is likely to infringe, upon Plaintiff's mark.  See Simon & Schuster, Inc. v. Dove Audio, Inc., 970 F. Supp. 279, 292

(S.D.N.Y. 1997).  As explained in more detail below, the eligibility of a trademark for Lanham

Act protection turns in the first instance on its distinctiveness as classified on a four-step scale

and, depending on its level of distinctiveness, whether it has acquired secondary meaning.  The

secondary meaning inquiry has increased significance in this Circuit in cases, such as this one, in

which the marks in question are used in connection with creative or literary works.

     *Classification of Mark*

     The distinctiveness of marks is evaluated under Judge Friendly's now classic

formulation that "set[s] forth four categories of terms, each one conferring a differing degree of

eligibility for trademark protection.  'Arrayed in an ascending order which roughly reflects their

eligibility to trademark status and the degree of protection accorded, these classes are (1) generic,

(2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.'"  <u>Simon & Schuster, Inc.</u>, 970 F.

Supp. at 292 (quoting <u>Abercrombie & Fitch Co. v. Hunting World, Inc.</u>, 537 F.2d 4, 9 (2d Cir.

1976)).  The classification of a mark can be determined on summary judgment as a matter of law

where, as here, there are no material disputed facts relating to the issue.  <u>Lemme v. Nat'l Broad.</u>

<u>Co.</u>, 472 F. Supp. 2d 433, 443 (E.D.N.Y. 2007).

     A generic mark is never entitled to protection, whereas a descriptive mark "is

eligible for protection if it has become distinctive of the producer's goods in commerce.  This

distinctiveness is generally called secondary meaning." <u>Simon & Schuster, Inc.</u>, 970 F. Supp. at

292.  Indeed, the United States Patent and Trademark Office does not permit registration of a

descriptive mark unless it has attained secondary meaning.  <u>See</u> <u>TCPIP Holding Co., Inc. v. Haar</u>

<u>Communications, Inc.</u>, 244 F.3d 88, 94 (2d Cir. 2001) (citing 15 U.S.C. § 1052 (e)–(f)).

     The distinction between marks that are suggestive and those that are merely

descriptive has been explained by the Second Circuit as follows:

> A suggestive mark, as might be expected, suggests the product, though it may take imagination to grasp the nature of the product. . . . [A] descriptive mark . . . is one that tells something about a product, its qualities, ingredients or characteristics.  It may point to a product's intended purpose, its function or intended use, its size, or its merit.

Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1076 (2d Cir. 1993).   A

descriptive mark "simply describes a product, it does not identify it . . . ."  Id. at 1076 (listing

descriptive marks).  By contrast, suggestive marks "are not directly descriptive, but do suggest a

a quality or qualities of the product . . . through the use of imagination, thought and perception

. . . ."  Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 385 (2d Cir. 2005) (internal citations

and quotations omitted).  Suggestive, arbitrary, and fanciful marks "are deemed inherently

distinctive and are entitled to protection."  Simon & Schuster, Inc., 970 F. Supp. at 292 (internal

citation omitted).  Therefore, if a mark is inherently distinctive, it is normally entitled to

protection without any showing of secondary meaning.  Twin Peaks Productions., Inc. v.

Publications Int'l, Ltd., 996 F.2d 1366, 1378 & n.4  (2d Cir. 1993).

The Second Circuit has noted, however, that there are "special concerns

implicated by Lanham Act claims against titles of works of artistic expression" arising from "an

author's significant First Amendment interest in choosing an appropriate title for his or her work

. . . ."  Twin Peaks Productions, 996 F.2d at 1378-79 & n. 4 (disclaiming as unnecessary, in light

of fact stipulation, a determination in that case as to whether a showing of secondary meaning

was required as to the title at issue even if it was suggestive, but recognizing that "[w]e have

applied a more stringent rule to literary titles . . ., in requiring the trademark proprietor to

demonstrate secondary meaning notwithstanding the suggestive nature of the title" (internal

citations omitted)).   The seminal Second Circuit decision on this point, <u>Rogers v. Grimaldi</u>, 875 F.2d 994 (2d Cir. 1989), concluded that "the expressive element of titles requires more protection than the labeling of ordinary commercial products" and cited with approval the McCarthy treatise's precept that "[a] confusingly similar title will not be deemed infringing unless the title alleged to be infringed, even if arbitrary or fanciful, has acquired secondary meaning."   <u>Rogers</u>, 875 F.2d at 998 & n.3 (citing J. McCarthy, <u>Trademarks and Unfair Competition</u> §10.2 (1984)); <u>see</u> <u>also</u> <u>Syler v. Woodruff</u>, 610 F. Supp. 2d 256, 264-65 (S.D.N.Y. 2009) (applying secondary meaning standard in infringement case involving suggestive title).

Neither party characterizes Plaintiff's BAD BOYS mark as generic.   The dispute as to classification centers, rather, on whether the mark is descriptive or suggestive.   Plaintiff asserts that BAD BOYS is a suggestive mark because it "is suggestive of the nature of Plaintiff's products, and . . . [a]lthough the mark may suggest certain themes and plots that pervade Kensington's romance novels, BAD BOYS does not describe the books themselves or their physical characteristics – the mark is applied to books, not bad boys."  (Pl.'s Mem. at 11 (citing <u>Playtex Prods., Inc. v. Georgia-Pac. Corp.</u>, 390 F.3d 158, 163 (2d Cir. 2004).  Plaintiff points out that all of the BAD BOYS titles feature protagonists who are young males who "initially appear[] to be 'bad,'" but later exhibit redeeming qualities (Pl.'s Mem. at 11), likening BAD BOYS to the "Beach Boys " mark, which the Ninth Circuit found to be suggestive when used in the music entertainment context because "[t]he Beach Boys' trademark [was not used] to denote its primary, descriptive meaning of 'boys who frequent a stretch of sand beside the sea.'  Instead, . . . 'The Beach Boys' trademark [was used] in its secondary, trademark sense, which denotes the music band . . . that popularized California surfing culture."  (<u>See</u> Pl.'s Mem. at 11 (quoting

Brother Records, Inc. v. Jardine, 318 F.3d 900, 907 (9th Cir. 2003) (internal quotations omitted)).)

Defendants argue that BAD BOYS is merely a descriptive mark, noting that the term "bad boys," as defined by Plaintiff, means "young males who behave poorly," and describes the male protagonists in Plaintiff's books, who are "a little naughty."  (Defs.' Opp'n Mem. at 3-4 (quoting Pl.'s Br. at 11; Dep. of Laurie Parkin ("Parkin Dep."), annexed as  Ex. E to Leibowitz Decl. at 75:22-24 (internal quotations omitted)).)  Defendants cite Gruner + Jahr USA Publ'g, 991 F.2d at 1076, in which the Second Circuit held that the use of "Parents" as the title of a magazine about parenting was descriptive.  (See Defs.' Opp'n Mem. at 4.)

The BAD BOYS mark, as used by Plaintiff, "conveys an immediate idea" about some of the characters in the books and, to that extent, displays a characteristic of descriptive marks.  See Bernard v. Commerce Drug Co., 964 F.2d 1338, 1341 (2d Cir. 1992) ("A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.")  The Court finds, however, that BAD BOYS is more appropriately classified as an at least marginally suggestive mark because it takes some degree of imagination to proceed from the words "bad boys" to the concept of a romantic/erotic novel in which a principal character exhibits antisocial traits at the beginning but undergoes a redemption by the end of the story.  Compare Simon & Schuster, Inc., 970 F. Supp. at 293 ("[I]t does not require thought and imagination to recognize that a product sold under the mark 'The Book of Virtues' is a book touching upon the subject of virtues.") and In re Scholastic Inc., 223 U.S.P.Q. (BNA) 431, 431-32 (T.T.A.B. 1984) (affirming the United States Patent and Trade Office's refusal of an application that sought to register THE LITTLES as a portion of the title of a children's

educational book series because it found that the title merely served to identify the main characters in each book, who were members of a fictional family named the Littles) with Twin Peaks Productions, 996 F.2d at 1378, n.4 ("The TWIN PEAKS mark is at least suggestive and not merely descriptive. TWIN PEAKS neither literally describes the television program nor describes the purpose or utility of the product. . . . Rather, the term 'requires imagination, thought and perception to reach a conclusion as to the nature of goods.'" (internal citation and quotations omitted)).

While the BAD BOYS mark is not as abstract as the one at issue in Twin Peaks, the literary works on which Plaintiff uses it are not mere catalogues of the exploits of young men behaving badly. The somewhat more complex romantic/erotic themes and plots of Plaintiff's BAD BOYS series warrant the conclusion that Plaintiff's use of the mark is suggestive.

Because the suggestive mark Plaintiff seeks to protect is used to denote literary works, Plaintiff must demonstrate that the mark has achieved secondary meaning in order to invoke the Lanham Act. See Rogers, 875 F.2d at 998 & n.3; Twin Peaks Productions, 996 F.2d at 1378-79 & n. 4.

*Secondary Meaning*

The suggestive mark of a literary work is protectable under the Lanham Act "only if it has acquired secondary meaning, that is to say 'an identity that consumers associate with a single source, even though the source itself may be unknown.'" Simon & Schuster, Inc., 970 F. Supp. at 293 (quoting Gruner + Jahr USA Publ'g, 991 F.2d at 1076). The question of whether a mark has acquired secondary meaning is "a factual determination, 'proof of which entails vigorous evidentiary requirements.'" Innovative Networks, Inc. v. Satellite Airlines Ticketing

Centers, Inc., 871 F. Supp. 709, 723 (S.D.N.Y. 1995) (quoting Bristol-Myers Squibb Co. v.

McNeil-P.P.C., Inc., 973 F.2d 1033, 1041 (2d Cir. 1992) (internal quotations omitted)).  The

owner of a descriptive mark "must demonstrate that the mark had acquired secondary meaning

before its competitor commenced use of the mark."  PaperCutter, Inc. v. Fay's Drug Co., 900

F.2d 558, 560, 564 (2d Cir. 1990).

      The Second Circuit has identified six factors that a court should examine when

determining whether a mark has acquired secondary meaning: (1) advertising expenditures; (2)

consumer studies that link a mark to a source; (3) unsolicited media coverage of a product; (4)

success of sales; (5) attempts to plagiarize a mark; and (6) exclusivity and length of a mark's use.

Simon & Schuster, Inc., 970 F. Supp. at 294 (citing Thompson Med. Co., 753 F.2d at 217;

Centaur Communications, Ltd. v. A/S/M/ Communications, Inc., 830 F.2d 1217, 1222 (2d Cir.

1987)).   When evaluating whether secondary meaning exists, no single factor is dispositive.

Thompson Med. Co., 753 F.2d at 217; accord Arrow Fastener Co., v. Stanley Works, 59 F.3d

384, 393 (2d Cir. 1995).

      Plaintiff has proffered evidence of advertising and promotional expenditures for

BAD BOYS books as of October 2003 and December 2004, and material from author and fan

websites, as well as customer reviews, sales figures, and actions taken against alleged infringers.

Defendants proffer, inter alia, evidence of resistance to Plaintiff's anti-infringement activities and

documentation of other creative works whose titles include the term "Bad Boys."   The secondary

meaning evidence is insufficiently unambiguous to support a determination as a matter of law in

favor of either party on the issue at this juncture.  Genuine issues of material fact thus preclude

summary judgment as to the eligibility of the BAD BOYS mark for Lanham Act protection.

*Likelihood of Confusion*

Even if a mark is protectible, a Lanham Act violation can be made out only where there is a showing of an actionable likelihood of confusion.  As with the question of protectibility, the Second Circuit imposes a higher than usual standard with respect to controversies involving literary titles.  Thus, while the Court must assess the likelihood of confusion by using "the familiar <u>Polaroid</u> factors, which include: 1) the strength of the plaintiff's mark; 2) the similarity of plaintiff's and defendant's marks; 3) the competitive proximity of the products; 4) the likelihood that plaintiff will 'bridge the gap' and offer a product like defendant's; 5) actual confusion between products; 6) good faith on the defendant's part; 7) the quality of defendant's product; and 8) the sophistication of buyers," <u>Gruner + Jahr USA Publ'g v. Meredith Corp.</u>, 991 F.2d 1072, 1077 (2d Cir. 1993) (citing <u>Polaroid Corp.</u>, 287 F.2d at 495, <u>cert. denied</u>, 368 U.S. 820 (1961)), the showing as to likelihood of confusion must be particularly compelling to warrant relief.  The <u>Rogers v. Grimaldi</u> Court concluded that, in general, the Lanham Act "should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression," <u>id.</u>, 875 F.2d at 999, instructing courts first to examine whether the disputed title has some artistic relevance to the accused work and holding that, if there is such a relationship, Lanham Act relief is available only where "the title explicitly misleads as to the source or the content of the work." <u>Id.</u>  Here, Plaintiff has the burden of demonstrating that "the title [of Defendants' book] is misleading in the sense that it induces members of the public to believe that [Defendants' book] was prepared or otherwise authorized by [Plaintiff]." <u>Twin Peaks</u>, 996 F.2d at 1379.

Defendants' use of the mark at issue here meets the first prong of the <u>Rogers/Twin</u>

<u>Peaks</u> inquiry – the term "Bad Boys" unquestionably has artistic relevance to the novel and two-volume anthology Defendants use it to denote.  Both involve young male characters who behave badly.

Neither the <u>Polaroid</u> likelihood of confusion inquiry nor the ultimate literary context question of whether Defendants' use of "Bad Boys" in their titles is misleading can be resolved, however, on this summary judgment motion practice.  Defendants' motion must be denied because Plaintiffs' evidentiary proffers, including evidence relevant to the issues of similarity, proximity, and bad faith, could support a fact finder's determination in Plaintiff's favor.  Plaintiff's motion must be denied because the record, construed in Defendants' favor, could be found insufficient to demonstrate likelihood of confusion or misleading conduct.  Accordingly, genuine issues of material fact preclude summary judgment as to Plaintiff's Lanham Act claim.

<u>State Law Claims</u>

*New York Common Law Unfair Competition*

The elements of causes of action for trademark infringement and unfair competition under New York common law "mirror [those of] the Lanham Act claims."  <u>ESPN, Inc. v. Quiksilver, Inc.</u>, 586 F. Supp. 2d 219, 230 (S.D.N.Y. 2008) (internal citation omitted).  To prevail on a claim of unfair competition under New York common law, Plaintiff must establish (1) ownership of a "valid, protectible mark" and (2) likelihood of confusion.  <u>Id.</u>  "[T]he standards for trademark infringement and dilution under New York common law are essentially the same as under the Lanham Act."  <u>Id.</u>  (internal citation and quotations omitted)).  "In a common law unfair competition claim under New York law, the plaintiff must show either actual

confusion in an action for damages or a likelihood of confusion for equitable relief." <u>Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.</u>, 58 F.3d 27, 35 (2d Cir. 1995) (internal citation omitted).  In addition, a common law unfair competition claim "is not viable without a showing of bad faith." <u>Genesee Brewing Co., Inc. v. Stroh Brewing Co.</u>, 124 F.3d 137, 149 (2d Cir. 1997).

        In addition to the factual issues identified earlier in this opinion with respect to protectibility and likelihood of confusion, the record on this motion practice reveals a genuine issue of material fact as to the question of bad faith.  "The inquiry into willfulness or bad faith considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product." <u>De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.</u>, 440 F. Supp. 2d 249, 278 (S.D.N.Y. 2006) (internal citation and quotations omitted).  The Second Circuit has held that "bad faith 'may be inferred from the junior user's actual or constructive knowledge of the senior user's mark.'" <u>Id.</u> (quoting <u>Star Indus.</u>, 412 F.3d at 389).

        Here, conflicting evidence as to Defendants' familiarity with Kensington and its titles prior to their e-book publication, Defendants' evidentiary proffers concerning independent creation, and the change in anthology titles from the e-book to the print editions of <u>IGBB</u> and Defendants' proffers as to the reasons for the change could support inferences favoring either party on the issue of bad faith.  Accordingly, genuine issues of material fact preclude the grant of summary judgment for Plaintiff or for Defendants with respect to the New York unfair competition claim.

*New York Anti-Dilution Law*

To prevail on a trademark dilution claim under N.Y. Gen. Bus. L. § 360-l, a plaintiff must show "ownership of a distinctive mark and a likelihood of dilution."[8]  See Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d 462, 485-86 (2d Cir. 2005) (internal citation and quotations omitted).  Specifically, a plaintiff must prove that the mark "is of truly distinctive quality," or that the mark has acquired secondary meaning.  Deere & Co. v. MTD Prods., Inc., 41 F.3d 39, 42 (2d Cir. 1994) (discussing N.Y. Gen. Bus. L. § 368-d (McKinney 1984), the predecessor to § 360-l ).  Therefore, "[o]nly 'extremely strong marks' are entitled to protection under the statute."  Johnson & Johnson v. Am. Nat. Red Cross, 552 F. Supp. 2d 434, 447 (S.D.N.Y. 2008) (quoting Bristol-Myers Squibb Co., 973 F.2d at 1049); see also Girl Scouts of the U.S. v. Bantam Doubleday Dell Publ'g Group, Inc., 808 F. Supp. 1112, 1130-31 (S.D.N.Y. 1992), aff'd, 996 F.2d 1477 (2d Cir. 1993) (noting that the New York anti-dilution law requires proof of "'an extremely strong mark — either because of the mark's distinctive quality or because it has acquired secondary meaning'" (quoting Mead Data Cent., Inc. v. Toyota Motor Sales, 875 F.2d 1026, 1032 (2d Cir. 1989))).  The Second Circuit has defined dilution "as either the blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey."  Deere & Co., 41 F.3d at 42 (internal citations and quotations omitted).  Plaintiff has not alleged that its BAD BOYS mark has been tarnished by Defendants' conduct.

---

[8]     "Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."  N.Y. Gen. Bus. L. 360-l (McKinney Supp. 2009).

The Court, therefore, only considers whether either party is entitled to summary judgment with respect to Plaintiff's claim of dilution by blurring under § 360-l.  "Traditionally, the likelihood of blurring has been governed by a six-factor test: (1) similarity of the marks, (2) similarity of the products covered, (3) sophistication of the consumers, (4) predatory intent, (5) renown of the senior mark, (6) renown of the junior mark."  Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 966 (2d Cir. 1996); accord Yurman Studio, Inc. v. Castaneda, 591 F. Supp. 2d 471, 489 (S.D.N.Y. 2008).

　　　　While the Court has determined that Plaintiff's BAD BOYS is marginally suggestive, it has not been shown to be an extremely strong mark and, as previously explained, genuine issues of material fact remain as to whether the BAD BOYS mark has acquired secondary meaning.  See Streetwise Maps, Inc., v. Vandam, Inc., 159 F.3d 739, 743-45 (2d Cir. 1998) ("To gauge a mark's strength, we consider two factors: its inherent distinctiveness, and its distinctiveness in the marketplace. . . .  Hence, although plaintiff's product is ranked as suggestive for its inherent distinctiveness, it is not strong in the marketplace for maps."); see also Katz v. Modiri, 283 F. Supp. 2d 883, 893, 900 (S.D.N.Y. 2003) (holding that a mark was "suggestive and thus distinctive" and had therefore satisfied the first element of § 360-l but noting that "a finding of suggestiveness does not guarantee . . . that the mark is a strong one. . . . Even if the Court finds a mark to be suggestive, it must still consider its distinctiveness in the market" (internal citations and quotations omitted)); Parenting Unlimited Inc. v. Columbia Pictures Television Inc., 743 F. Supp. 221, 231 (S.D.N.Y. 1990) (noting that, under the New York anti-dilution statute, "only the strongest, most well-established marks are protected").  In addition, the record on this motion practice reveals a genuine issue of material fact as to whether

Defendants acted with predatory intent when they selected the title of their book.  See Mead Data Cent., Inc., 875 F.2d at 1037 ("Predatory intent involves more than mere knowledge of the senior mark – it requires a showing that the junior user adopted its mark hoping to benefit commercially from association with the senior mark.")  Accordingly, genuine issues of material fact preclude the grant of summary judgment for Plaintiff or for Defendants with respect to the trademark dilution claim under N.Y. Gen. Bus. L. § 360-l.

Fair Use Defense

Defendants claim a fair use defense to Plaintiff's Lanham Act claim based upon a right to use the term "BAD BOYS" in a descriptive sense.  (Defs.' Opp'n Mem. at 16-18.)  The fair use doctrine allows use of another's protected mark "to describe certain aspects of the user's own goods."  EMI Catalogue P'ship, 228 F.3d at 64.  Fair use also normally protects a term that is incorporated in a mark when that term is "the only reasonably available means of describing a characteristic of another's goods . . . ."  Id. at 65.  "Fair use analysis also requires a finding that defendants used the protected mark in good faith."  Id. at 66.

As explained earlier, a genuine issue of material fact exists as to whether Defendants acted in good faith.  Furthermore, the record, construed in the light most favorable to Plaintiff, does not compel the conclusion that use of the term "Bad Boys" is the only reasonably available means of describing a characteristic of Defendants' works.  Accordingly, Defendants' motion for summary judgment as a matter of law with respect to fair use is denied.

CONCLUSION

For the above-stated reasons, Defendants' and Plaintiff's respective motions for summary judgment are denied.  The parties must promptly contact Magistrate Judge Peck's

chambers to schedule a settlement conference.  If the parties fail to settle their dispute, they must

appear for a Final Pre-Trial Conference on **January 15, 2010**, at **11:00 a.m.**  The parties must

confer and make submissions in advance of the Final Pre-Trial Conference as required by the

previously entered Pre-Trial Scheduling Order (docket entry no. 10).  This Order resolves docket

entry no. 25.

SO ORDERED.


Dated: New York, New York
       September 25, 2009

_____
LAURA TAYLOR SWAIN
United States District Judge
